Good morning, Your Honors. If I could, I'd like to reserve two minutes for rebuttal. This case, in many ways, comes down to, was the plea agreement an illusionary agreement? Was there, in actuality, a contract between Mr. Suzuki and the government, or was there not? It's Mr. Suzuki's position that when he entered into this plea agreement, he had the ability to litigate the amount of tax loss. It's the government's position that, in fact, he didn't. You have ten minutes. You can use it any way you want to, but if I were in your shoes, I would not be talking about that issue. I would move on to the others. Okay. I think you covered it well in your brief. Okay. The others are worthy of discussion. Okay. Well, but I'm just one judge. No, I understand. I'm not sure which the others are. I'm not under — I'm not sure which others that Your Honor would like me to address, and I'm happy to start with that. I thought your argument was getting into the business of whether your client could raise on appeal the issue of tax loss. No. No. And I misunderstood. No. I'm sorry. My argument was going to be the government's position, in essence, is that Mr. Suzuki entered a deal. Mr. Suzuki thought in the district court he was going to be able to litigate the issue of, in fact, whether or not there was a tax loss because there was an agreement with regard to the amount of money that the government felt had contributed to the tax loss. Now, can I ask you, if I understand this correctly, what the problem is? Mr. Suzuki's position is that there was no tax loss essentially because the other person, who was the one who would have been paying the taxes, had overpaid taxes for some other reason, and therefore the government didn't lose any money. It got everything it should have gotten on his return. That was — that's one of his positions. That argument was presented to the district court in the response to the probate or pre-sentence report? Yes, it was. And did the district court — this is totally aside from whether it was a loan or not a loan. I understand that. All right. No, I want to see if I understand. Okay. All right. And did the district judge comment on that argument? Did he make any findings as to whether there was an actual tax loss? Did he follow Rule 32? I don't believe that he followed Rule 32. He made a finding there was a tax loss, however, based solely upon the information in the pre-sentence report, which was the information that the government provided to the probation office. Did he resolve the disputed issue in any way? No. I can find nothing in the record. The only thing that he did was Suzuki made multiple arguments as to why there was not a tax loss. The judge resolved one of the arguments by saying that had been resolved in a previous trial, ignoring the fact that that conviction had been reversed on appeal because of the unreliability of the evidence that had been presented at the previous trial. Had it been reversed before the sentencing? That is correct, Your Honor. And he relied on the finding that was reversed? That is correct, Your Honor. So this is a very unusual situation. I understand that when you're litigating tax loss at sentencing, that it may take a certain amount of time to resolve that because it's a little bit more complicated than some sentencing issues, depending on the circumstances. However, I believe the precedent from this court makes it clear that even when you're talking with regard to a tax loss, that the district court has to spend the time to resolve that question. And the case that was cited in the opening brief, that's the case of United States versus Standard. That case involved the question of whether or not referral fees were deductible. And in California back in the late 80s, an unsolicited referral fee was legal, but a solicited referral fee was illegal. And the Standard case apparently took three appeals to resolve the matter that the district court, in fact, had an obligation to determine whether or not the tax deductions taken by the taxpayer qualified as a deduction or did not qualify as a deduction. And it seems to me that Standard makes it relatively clear that under Rule 32, you simply have to look at the arguments presented as to whether, in fact, there is a tax loss and resolve that issue at the time of sentencing. Here, I don't believe that was done. It's clear that that was not done from my perspective. Admittedly, the judge made several statements in sentencing, and I think I've covered this in the brief, that, well, if the tax loss was less, he was still going to give essentially the same sentence, and he used two different figures, if it was half the amount or if it was a quarter of the amount. And I think, in essence, what happened here, and we have to remember the time frame of this sentencing, this sentencing happened relatively recently after Booker came down. It happened, I believe, after Ameline II, but before in-bank decision in Ameline. And I believe that, in fact, the district court judge was, to a certain extent, under the impression that Booker eliminated consideration of the guidelines and that we were very close to the sentencing before the guidelines were ever placed into existence. He was a little equivocal about it, but he did say that the guidelines were a factor. Yes, he did say that. He did say that they were a factor, and the significant thing about that is the figures that he used made minimal difference when you calculated the tax loss. Obviously, if Suzuki is right, and there was a scheme where people contemplated defrauding the government out of money, for some reason or other, they did not go through with that scheme, and, in fact, the government did not get defrauded out of money. You're in a different sentencing position than if you, in fact, defraud the government out of, in this case, a million and a half dollars, is what the probation office said. Interestingly, out of earning $1,700,000, the tax loss here was calculated to be $1,500,000. Okay. An interesting calculation. But clearly, in this instance, Mr. Suzuki did not get what he bargained for in the plea agreement, which was a resolution of the amount of tax loss. Did you say you wanted to save three minutes? Actually, I said two, but I think that perhaps I'll reserve right now, if that's agreeable with the Court, or if the Court has questions, I would try.  Two and a half. Thank you. May it please the Court. Les Osborne for the United States District of Hawaii. Can I ask you the same question I asked your co-counsel? Is that the dispute that was presented to the district court that Mr. Suzuki said, among other things, there was no tax loss because all the taxes that were actually due and more were paid by the other gentlemen, and therefore the government didn't lose any money? Your Honor, it is my recollection that at the sentencing there was the PSR, which was predicated on the government's figures, and a schedule of the tax loss submitted by the United States. My review of the record, I was not involved in the Suzuki case. I was very involved in Bulware. I tried it twice. But my recollection is there was no argument of the loan issue at that time. I'm not talking about the loan issue. I'm saying this. I read the brief. They're saying the taxes were overpaid by the gentleman whose case you tried. And as a result, the government got all the taxes it was actually entitled to for getting the loan. I do not recall my review of the record. I was not involved in the actual sentencing. But I do not recall that precise argument being made at that time, Your Honor. I think it's important to note that the issue that this Court reversed Bulware on had nothing to do with the tax loss figure. The reversal on Bulware 1 came from the district court refusing to allow the jury to hear evidence of litigation, civil litigation, in the Hawaii State Court concerning whether or not HIE property had been given to Mr. Bulware's mistress, for lack of a better term. It did not opine on the issue of tax loss. That was not the issue which this Court took issue with. It was simply limited. The reversal was limited to the admissibility of the State evidence of the action between Jin Sook Lee and HIE, the corporation. And the court, the district court, went to great lengths in sentencing Mr. Suzuki in pointing out that he was considering the various issues under 3553 that the tax loss really, I think his quote was, I don't care if it was half as much, I don't care if it was a quarter as much, under the now advisory guidelines, the issues upon which the court is moving forward is the 3553 issues, which he then outlined in great detail. He did say a number of inconsistent things. When he says, he says, I don't care whether it's half as much or a quarter as much, he didn't say, I don't care if there's no loss, but he says then it's a — he also says one of the big factors that will affect the sentence is the amount of the tax loss resulting to the government. So he seems, during at least parts of the print sentencing proceedings, to care a lot about how big the tax loss is. Well, Your Honor, I think what he's saying is obviously there has to be a loss. This was a conspiracy to obstruct justice and to defeat the IRS in the collection of tax. But the amount of the loss, he says, is one of the big factors that will affect the sentence. So I don't know how you can say that and then say, I don't care whether it's half as much, a quarter as much. Well, that's — I think, Your Honor, if you parse the district court's comments sentence by sentence, you're right. Problem, yes. There's a problem. But if you look at the district court's colloquy on the issue of sentencing, under the now advisory guidelines, he was saying an exact termination of tax loss is no longer critical. It may not be critical to a sentencing judge, but it could be critical to an appellate body who has the responsibility for determining whether a sentence is reasonable. And under the advisory guidelines, if there's no tax loss, the sentencing range is something like zero to six months. That's correct, Your Honor. That's a course of a much different color in terms of our looking at a sentence in terms of its reasonableness. Your Honor, I think — Let me finish my comments, and then you can respond. I'm sorry, sir. It may be that a district court can say, I basically don't care what those guidelines say, but from our point of view, in determining whether a sentence is reasonable or unreasonable, we have a perfect right to look to the advisory guidelines and compare it to what the sentence is, especially in a case where the district judge made no factual resolution of the objections to the presentence report. Your Honor, I apologize for stepping on your line there. I think that Jennings' case, which isn't in our briefs, but we submitted in a letter to the Court, there's a footnote in that case that points out that now that we're dealing in this whole new world of advisory guidelines, there may be little point in requiring district courts to engage in the purely academic exercise of resolving complicated factual questions in order to delineate exact guideline ranges if the case settled on a reasonable sentence in light of the factors in 3553A. Now, that's just a footnote. That wasn't a holding, but that's — It's a little contradictory to what most cases say, and what the government usually would like, which is you start with the guidelines and you figure out what the sentence is and you proceed from there. Certainly, Justice Breyer wouldn't be very happy with that footnote. But let me just tell you what the problem seems to me to be in this case. What the judge says is now despite defense counsel's attempt to confuse the issue, the amount involved in these transactions to which the defendant has admitted that he participated as co-conspirator is not in dispute. And the judge keeps saying throughout this, I don't want to hear about this dispute. At one point he says, why don't you two just settle this, tell me what the amount is. And at the other, he says, well, the amount's clear. There's no dispute about the amount. The defendant keeps trying to say we do have a dispute about the amount. Here are our arguments. Here are our reasons. We don't think this is the amount of loss. And the judge doesn't want to hear about it. That seems a little troublesome. Your Honor, had the Court applied the loss guidelines and based his sentence upon those guidelines, it would have been in a range of from 57 to 60 months. If the loss figure's correct. Correct, Your Honor. Mr. Suzuki received a sentence of 36 months. And if there was no loss, as Judge Hawkins said, it would have been somewhere from up to six months. But in the under the advisory guidelines, that was a possible sentence, Your Honor. But in this case, the Court applied all of the factors, not all of them, significant number of the factors set out in 3553A and based his sentence on those factors. Suppose, hypothetically, that you had a sentence for a district court based on undisputed facts, looked to the guidelines, and then imposed a sentence six times lower than the lowest mark of the advisory guidelines. Do you think the government would appeal such a case? I'm sure the government would appeal such a case, Your Honor. I would hope you would. And in this case, if one assumes, and I understand it's a big assumption, if one assumes that there's some problem with this loss figure, you're looking at a sentence that is six times the high-water mark of a no-loss situation. Right? That's correct. But there was no specific evidence or challenge of that loss figure at the sentencing. Mr. Suzuki has never said, other than the argument that all of this is loans, which has been rejected by two juries now, by one Ninth Circuit opinion, that's not really an issue, Your Honor. There's no argument this money didn't come from loans. Now, the exact amount of money, as it applies to Mr. Suzuki --" You're coming down to four seconds. Do you want to wind it up with a sentence? Yes, Your Honor. I'm done. Thank you. Okay. Why don't we start by having you tell us where in either the response to the PSR or in the presentation to Judge Rafiti, defense counsel for Suzuki specifically raised the question of no tax loss, not loan, but no tax loss. No tax loss. He did that, Your Honor, in three different places in his submissions. What he did was he incorporated filings that had been made by Boulware at Boulware's sentencing, because we were you were talking about a document stack that is a foot high. He submitted those by incorporation. And he referred to that at least two different times in his submission. He filed, I believe, three objections to the presentence report. He filed that, I believe, in his first objection, and he also filed it in, I believe, his third objection. There was a sealed excerpt to the record that was submitted by Mr. Suzuki in this case, and those submissions are included within the sealed excerpt of record showing the exact arguments that Boulware put forth at his sentencing and in his sentencing memorandum, which, coincidentally, the judge never addressed at his sentencing the first time around either. Is the argument dependent on whether or not these transactions were loans? No. That was only one of the arguments. There were a total of three arguments. One argument was that they were a loan. The second argument was that, in any event, taxes were overpaid. And a third argument was this was a return of capital that is a non-loan transaction in any event because there wasn't a profit made by the corporation during the year. So there were three arguments that were submitted in sentencing, and actually they were submitted twice in the pleadings submitted by Mr. Suzuki. Mr. Suzuki attempted to raise that at sentencing and was cut off from doing so. I think that's rather clear. All right. Thank you, counsel. Thank you. The case just argued will be submitted.
judges: Goodwin, Reinhardt, Hawkins